## Cherry Appeal

550 

*Brown & McKnight,* for appellant.

*R. A. Leuthold,* for appellee.

FLICK, P. J., March 22, 1961.—This is the appeal of E. T. Cherry from the tax assessment for the year 1959, as fixed by order of the Warren County Board of Assessment and Revision of Taxes on July 23, 1959, following appeals to said board, on 119 acres of land in Freehold Township, Warren County, designated on the county tax map and property record card as YV-1-8374.

This is one of 12 appeals, by various property owners, from assessments of various parcels of land planted in Christmas trees for the commercial market. . . .

### Discussion

The reasons assigned for this appeal are that the assessment is: (1) not comparable to assessments of similar property; (2) higher than the fair sales value of the property; (3) assessment of Christmas trees but no other crops are assessed, and (4) purely speculative and based on incorrect assumptions. No case dealing with assessment of land on which evergreens had been planted for the Christmas tree market has been cited, and none can be found. . . .

The property record card, showing valuation, and assessment at 50 percent thereof, was placed in evidence as appellee's exhibit no. 1, and the chief assessor testified as to making the assessment. The card shows appellant's 119 acres to consist of 79 acres of woodland valued at $8 per acre, total $630, and 40 acres of

Christmas tree land valued at $200 per acre, total $8,000, making a total property value of $8,632 and the assessment of 50 percent thereof, or $4,315. Testimony by the chief assessor showed that a valuation of $200 per acre for Christmas tree lands, determined by Mr. Fuellhart, had been increased to $300 by Mr. Camp but this change had not been made on the property record card of E. T. Cherry, due to clerical oversight. With this correction, the assessment for this property would be fixed by order of the Board of Revision of Taxes at $6,315. The chief assessor also testified that the information as to the acreage of different classes of land was obtained, and the valuation for each class was established, by employes of the Cleminshaw Company. The values are the estimated market value of the various classes of land, and the chief assessor adopted these valuations and made the assessment. It is, therefore, apparent that the validity of the assessment depends entirely on the legality of the manner in which the Cleminshaw Company employes determined their estimated market value. This portion of the county's case did not show how Cleminshaw employes arrived at the valuation which they placed upon the cards, but Mr. Camp and Mr. Fuellhart testified at some length as to their method of establishing such values, in rebuttal.

In support of this appeal, testimony was given by appellant, by Merle Dodd, a farmer turned real estate agent, engaged in selling rural properties and familiar with the appellant's 119 acres and neighboring land; by Robert Boyce, Pennsylvania State University Regional Marketing Agent for Warren, Crawford and Erie Counties, familiar with Christmas tree lands and the Christmas tree business generally in Warren County, who identified exhibits 2 and 3, bulletins labeled "Pennsylvania Crop Reporting Service— Christmas Tree Report", released August 1958 and

July 1959 by the United States and Pennsylvania Departments of Agriculture. Two of the other 11 taxpayers who are appealing from assessments of their Christmas tree lands were also called by appellant: John H. Stewart, who testified as to sales of timber land for prices ranging from $75 to $800 per acre, whereas this classification was valued by the Cleminshaw Company at $4 to $12 per acre; and Clare Capwell, owner of land in the same township as this appellant, who testified that land in Freehold Township, and elsewhere, suitable for raising Christmas trees, could be purchased for from $8 to $10 per acre, and the cost of planting two-year Scotch pine at 1,000 to the acre, ran from $35 to $40 per acre. Appellant testified that he bought his 119 acres, part of an abandoned farm, in 1953, for $800; that it was on a dirt road, up hill, which he could not drive in bad weather; that eight out of 10 neighboring farms are abandoned; that the land was too poor to plant anything but trees; that such land is the best type for Christmas trees; that he and appellant Brown planted 15,000 trees on 10 acres of good crop land but suffered a 90 percent loss.

Appellant then put in evidence letters from the taxing authorities of other counties, as follows; Blair County has no separate classification of land used for growing Christmas trees. Erie County assesses Christmas tree acreage the same as any other farm land. Indiana County values the land as tillable or not, regardless of what may be planted on it. Crawford County classifies land as good, common, medium, or poor as to 7 types ranging from crop land to waste land. Three types, to wit: Crop land, pasture land, and evergreens, have the same per acre valuation: Good, $40, medium $30, poor $20. Timber land is valued at $30 per acre for good, $20 for medium and $10 for poor. Reforested land has only one classification at $10

per acre. The other three types have only a "poor" classification as follows: Cutover land $10, brush land $10, waste land $6. These are base values said by the Crawford County Chief Assessor to be 30 percent of market value; 40 percent of the base value is the assessed value. Under this system the market value of Christmas tree land is $133, $100 or $66 per acre, and the assessment is $16, $12 or $8 per acre.

This closed appellant's case in chief. The county then called, as on cross examination, four of the other appellants, also Mr. Fuellhart who explained at length the method he used to arrive at an estimated market value for Christmas tree land of $230 an acre, and Mr. Camp who explained why he increased this valuation to $300 per acre. On sur-rebuttal, appellants Clare Capwell and John H. Stewart were recalled, also Ira Brown, a forest engineer familiar with Christmas tree land in Freehold Township. The county also put in evidence sales of land in Warren County which included land on which Christmas trees were planted. This concluded the testimony applicable to the general principles of valuation and assessment as applied to land planted in Christmas trees for the commercial market, and to this appellant's land in particular.

As to all of this evidence, there is little or no contradiction of any material fact. No sales of land used solely for the growing of Christmas trees were known to any witness. Some sales of properties which included such land were testified to by appellant's witnesses and the county's witnesses, but little or no weight can be given to such evidence, since no basis was established whereby a portion of the sale price could be taken as the value of that part of the land on which Christmas trees were planted. There were sales of land, including a Christmas tree plantation in which the trees had not been trimmed and had grown too large to be sold as

Christmas trees. Such land is timber land. There was a sale to a lumber company of land planted in evergreens under soil bank regulations, which prohibit cutting until the trees are too big to have any market as trees. There was the sale of the 114 acres Fisher property, 15 acres of which was planted in Christmas trees, but no basis for determining what part of the $11,750 sale price should be assigned to the Christmas tree land. Also, sale of 170 acres of land, 10 miles from appellant's 119 acres, with 10,000 trees planted on about five acres, for $3,000; sale of 93 acres in Conewar Township, Warren County, including 10,000 trees sheared three times so as to be salable as Christmas trees, for just under $25 per acre.

As stated In re Assessment of Real Estate, 34 Northamp. 327, the law governing tax assessments is statutory, and neither assessors, county commissioners nor courts have authority to act in a manner not provided by statute. The statute provides that real estate shall be assessed at the established ratio, 50 percent in Warren County, of its actual value or the price for which the same would separately bonafide sell: Pages 330, 331, citing the Act of January 18, 1951, P. L. (1951) 2138, sec. 1; July 17, 1953, P. L. 464, sec. 2; May 17, 1957, P. L. 150, sec. 1; 72 PS §5453.602; Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners, 229 Pa. 460. This means that the fair market value must be determined and must be the basis of the assessment. When there have been no sales of the land in question, and no sales of similar property to act as a guide, as in the instant case, " 'An assessor must of necessity use his best judgment in determining what he believes the land would sell for at a bonafide sale after due notice' ": In re Assessment of Real Estate, supra, page 332.

When there are no sales which would indicate the market value of the property, when the market is stag-

nant as the evidence shows it to be in the instant case as to land planted in Christmas trees, the necessity of establishing market value being imperative, other evidence likely to establish market value must be shown: Hudson Coal Co., 327 Pa. 247, 252. All of such testimony must be directed to determining the *value of the property in the market*. All testimony "must be directed to determining the value of the property in the market, a determination which is not controlled by any single factor and which is ultimately made on the basis of competent testimony as to what the property is worth in the market at a fair sale: Park Drive Manor, Inc., Tax Assessment Case, 380 Pa. 134, 136": In re Assessment of Real Estate, supra, page 334.

In the instant case, much evidence was presented as to the Christmas tree business in Warren County. In the court's opinion, the controlling factors are that all testimony showed that: (1) land suitable for raising Christmas trees is marginal land, not good enough for farm crops; (2) that such land, often abandoned farm land, can be purchased in Warren County for from $5 to $15 per acre; (3) that the hazards of growing Christmas trees (fire, disease and pests) are considerable and cannot be insured against for a reasonable premium; (4) that it requires at least eight years for planted trees to mature to a size where they can be sold, and the trimming or shearing required depends upon the rate of growth; (5) that the planting of Christmas trees on suitable (marginal) land has little effect for the first two or three years on the value of the land; (6) that value in later years depends to some extent on the amount of shearing done and the number of trees for sale in Pennsylvania, which has increased every year; (7) that there is no demand and no market for land planted in Christmas trees, and it could not possibly be sold for the $300 per acre value set by Mr. Camp and adopted by the chief assessor.

This evidence is sufficient to overcome the prima facie case established by the record of the assessments. The rule is stated in Pennsylvania Stave Company's Appeal, 236 Pa. 97, page 102, as follows:

". . . When the case on appeal came into the court below the proceeding was de novo. A prima facia case was made out by offering in evidence the record of the assessment in the office of the county commissioners together with such data as was before the board of revision, but this only made out a prima facie case, and whether it should be sustained or not, depends upon the evidence produced at the hearing. If the evidence as to valuation be conflicting, some of it sustaining the valuation fixed by the board of revision, the court would be warranted in so holding, but if all the testimony taken at the hearing shows the valuation to be too high, it is the duty of the court to find the facts in accordance with the evidence thus produced. As we read the record, all of the evidence shows that the valuation fixed by the board of revision was too high and clearly it was sufficient to overcome the prima facie case." In Flamingo Apartments, Inc., v. Board of Revision of Taxes, 383 Pa. 223, the court said: page 227. "The evidence on value was conflicting, thus the determination was for the court below; and its determination, supported by competent evidence, cannot be interfered with on appeal, there being no abuse of discretion: Chestnut Street Tax Assessment Case, 361 Pa. 231, 234, 64 A. 2d 769; Park Drive Manor, Inc., Tax Assessment Case, 380 Pa. 134, 136, 137, 110 A. 2d 392."

For another reason, the prima facie case established by the assessments of Christmas tree land must fail. They were not, in this court's opinion, made upon a proper legal basis.

"The law governing assessments of land for the

purpose of taxation is statutory, and neither the assessors, county commissioners, board of revision, nor the courts on appeal have authority to proceed in any other manner than is prescribed by the statutes. (3 P & R Coal & Iron Co. v. Northumberland Co. Commissioners, 229 Pa. 460, supra, 464). . . .

"The statutory method for the assessment of property is set forth in section 602, as amended. (1951, January 18, (1952), P.L. 2138, sec. 1; 1953, July 17, P.L. 464, sec. 2; 1957, May 17, P.L. 150, sec. 1, 72 P.S. 5453.602). Said section provides: 'It shall be the duty of the chief assessor' (1) 'to assess, rate and value all subjects and objects of local taxation . . . according to the actual value thereof'; (2) 'after there has been established and completed for the entire county the permanent system of records . . . required by section 306 of the act . . . real property shall be assessed at a value based upon an established predetermined ratio . . . not exceeding seventy-five per centum (75%) *of its actual value or the price for which the same would separately bone fide sell*'; (3) 'the price at which any property may actually have been sold shall be considered but shall not be controlling'; (4) 'instead such selling price estimated or actual shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the county'; (5) 'after the completion of the permanent system of records for the county, when assessing real property, the chief assessor shall also take into consideration the value of such property as indicated by the use of the permanent system of records, cost charts and land values applied on the basis of zones and districts as well as the general adherence to the established predetermined ratio.'

" 'Actual value or the price for which the same would separately bona fide sell' and similar terms used

in statutes governing assessments have been uniformly held to mean 'market value as distinguished from actual value; or, more accurately expressed, actual value limited and defined by market value:' Washington County v. Marguis, 233 Pa. 552, 558. (cases cited). Each property should be assessed at its fair market value; it cannot be assessed at more than its fair market value or higher than the percentage of value uniformly fixed throughout the taxing district. (cases cited).

" 'By fair market value is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses to which the property is adapted and might in reason be applied': Penna. Co. for Ins. on L. & G. Annuities, 282 Pa. 69, 74. (cases cited) ". . . 'If, however, there had been no recent sale of the lands under consideration, or of other lands of like quality similarly situated, or *no general asking or selling price in the neighborhood* is shown, an assessor must of necessity use his best judgment in determining what he believes the land would sell for at a bona fide sale after due notice. . . . (In such case) the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation.' P & R Coal & Iron Co. v. Northumberland County Commissioners, 229 Pa. 460, supra, 466, 467 [cases cited]": In Re Assessment of Real Estate, supra, pages 330-33.

In Hudson Coal Company's Appeal, 327 Pa. 247, the appeal was from assessment of coal land, and the court found that there was no demand for such land, no sales; the market was stagnant. The evidence before the court in the instant case shows the same situa-

tion. No sales of land planted in Christmas trees, alone, were shown. When the landowners and real estate agents were asked their opinion as to the price for which such land would sell, they gave such answers as: "Very hard to say for I don't think I could find a buyer"; "Don't know, it would be hard to find a buyer"; "Don't know what land planted would sell for as there is no market"; "A losing business, I would be lucky to find a buyer"; "Hard to say what it's worth, no buyers"; "Don't know what it's worth, no sale"; "I had no idea what land planted in Christmas trees would sell for. None is being sold"; "A losing business, no one wants to buy plantations."

In the Hudson Coal Company Appeal, supra, the court said, page 252:

"When faced with such a situation, the necessity of determining value being imperative, courts permit the introduction of other evidence likely to establish it. All relevant elements tending to appreciate or depreciate value are admissible. In such cases it is proper to adduce evidence upon all matters affecting probable selling price and any other element of value that would influence the mind of a purchaser: *Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners*, 229 Pa. supra."

"All elements of intrinsic value tending to give the property a market value should be considered, . . ." Pennsylvania Stave Company's Appeal, 236 Pa. 97, 103.

The purposes for which land is best suited, or for which it may be used to advantage, may be considered *in order to determine for what price it will sell.* The land may be salable as a hotel site, but it is not proper to subtract the cost of building the hotel from the estimated sale price of the land with the hotel on it, and treat the difference between these two sums as the

value of the land. See Chatfield v. Board of Revision of Taxes, 346 Pa. 159, 163, where the court said:

" 'Such a method would be speculative and fanciful.' " The court also said: " 'Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued. . . .' [cases cited]."

The profit which a taxpayer can achieve by use of his property may be considered, insofar as it affects market value, but is not controlling. In Algon Realty Co. Tax Assessment Appeal, 329 Pa. 321, page 323, the court said:

"The other witness called by the borough based his estimate of value exclusively on the capitalization of his estimated rental value of the property. While rental value may be taken into account, it never can constitute the exclusive standard for fixing the market value of property: [cases cited]." See also Flamingo Apartments v. Board of Revision of Taxes, 383 Pa. 223, pages 225 and 226.

In Park Drive Manor, Inc., Tax Assessment Case, 380 Pa. 134 (1955), the court said, page 136:

"In determining market value many factors may be relevant, including capitalized rental income, comparable sales, location of the property and conditions of the buildings: [cases cited]. But all the elements considered must be directed to determining the value of the property in the market, a determination which is not controlled by any single factor and which is ultimately made on the basis of competent testimony as to what the property is worth in the market at a fair sale [cases cited]."

Was the assessment of Christmas tree land arrived at by following the law as established by statute and the cases above quoted? The chief assessor adopted the valuations made by Mr. Camp, of the Cleminshaw Company, as he had a lawful right to do. Hammermill Paper Co. v. Erie, 372 Pa. 85, holds thta assessors ". . . may adopt as their own the valuation of property made by experts or specialists": page 96. This valuation was $300 per acre, and the 50 percent uniform ratio was then applied to obtain the assessed valuation. Inquiry must be made, therefore, as to whether the $300 valuation was arrived at in compliance with law.

The record shows that Mr. Fuellhart, a consulting engineer, made what he calls a natural resource valuation. Employed by the Cleminshaw Company to secure information which could be used as a guide or estimate for the purpose of valuing timberland and land used for commercial growing of Christmas trees, he worked about six months in 1957 and 1958, to make his forest report. He had never appraised Christmas tree land before that time but was familiar with many of the plantations in Warren County, being a lifetime resident and having walked through the planted areas while appraising other properties. He made quite a study of the Christmas tree business in this county, reading bulletins and talking to local growers. He obtained detailed figures as to costs of land, trees, planting, pruning, number of trees per acre, percent of survival, selling price of trees and growth cycle from planting to marketing, in order to arrive at a per acre estimate of gross income from the sale of Christmas trees, gross cost involved, and net profit from one cycle of growth. He determined that the prime factors were: planting density, survival rate,

propagation (number of years of growth to marketable size) and selling price per tree.

In order to obtain dollar figures for these factors, Mr. Fuellhart conferred with five local growers of Christmas trees (four have appealed from their assessment). He computed the lowest common denominators of their estimates as follows: Number of trees planted per acre, 1,200; percent surviving to marketable size, 75 percent; years of growth required from planting to marketing, 10 years; sale price per tree, $1.36. The gross profit per acre from these figures is $1,224 (75 percent of $1,200, or 900 times $1.36 per tree). He then computed the total cost of raising one acre of trees for the market, by taking the average of figures obtained from growers as to: Cost per acre of suitable land; cost of preparing land for planting; cost of 1,200 trees; cost of planting, pruning, etc. The total of these average figures is $530. By subtracting this from the gross profit of $1,224, Fuellhart arrived at an estimated net profit from one acre planted in Christmas trees, of $694. As it takes 10 years to earn this profit, Fuellhart applied present worth tables and found that the amount, now, which in 10 years at 6 percent could achieve his estimated net profit, is $389. His final estimate, for which no statistical facts or basis was given, was that the sale price would be 50 percent to 60 percent of present worth, and, therefore, he estimated market value at $230 per acre. The figure he reported to Mr. Camp was $200 per acre.

Mr. Camp testified that Mr. Fuellhart's figure was sent to the Cleminshaw Company's office in Cleveland and put through process; that sales of properties which included Christmas tree lands were checked, particularly the Fisher property above-referred to, and that "we found it necessary to include other costs such as

taxes and amortization of equipment over the ten year growth cycle." Costs were thus increased from $530 to $572. Using Mr. Fuellhart's gross income figure, and substracting costs of $572, produced an estimated net income of $652. Mr. Camp then diverged from Mr. Fuellhart's computation of present worth by using 10 percent rather than six percent and arrived at an estimated net present worth of $299. Mr. Camp discarded Mr. Fuellhart's theory that the planted land would sell for from 50 percent to 60 percent of the present worth of estimated net profit. From talking to owners, he found that land suitable for growing Christmas trees sold at from $5 to $25 per acre, unplanted. Using an average of $10 per acre for land and adding this to his estimate of $299 produced a figure of $309 per acre, and Mr. Camp submitted to the chief assessor an estimated market value of $300 per acre. Mr. Camp accepted the owners' statement as to whether evergreens were planted for timber or for the Christmas tree market. The $300 per acre valuation was applied to all Christmas tree land in Warren County, regardless of location and regardless of the age of the trees, provided they had not grown beyond marketable size. As previously stated, Mr. Fuellhart's $200 valuation was erroneously left on the property record card of E. T. Cherry.

The system or formula used to estimate the market value on which assessments of Christmas tree lands are based makes use of a comprehensive set of undisputed figures as to the cost of purchasing, planting, pruning and growing Christmas trees to market condition and size. If one could be sure that the selling price of trees would remain stable, theirs could well be the most accurate method of calculating estimated net income. But is it a proper legal basis for assessment? In the court's opinion, it is not.

In the first place, the estimated gross income from selling trees is based on the assumption that the selling price per tree, average $1.36 standing in the field, will not go down during the growing cycle period of about 10 years. Such assumption is speculative and highly unwarranted by the evidence. Appellant E. T. Cherry testified that when he bought his land and started planting in 1953, trees could be sold for $2.50 per tree, but in 1961 he could not get more than $1 to $1.25 per tree. He stopped planting after 1957, for he could see no profit in the future. All evidence showed that the number of trees planted in Pennsylvania was going up steadily. The Pennsylvania State University regional marketing agent testified that he was advising growers to plant for timber and not for the Christmas tree market; that the sale price per Christmas tree was going down and would continue to go down; that in Pennsylvania 10 trees were being planted for each one sold, in New York and Ohio it was 15 to 1 and in Michigan, 25 to 1. The County's witnesses did not consider the sale price of trees at any future time. Mr. Fuellhart testified that if the sale price of trees goes down, the land should be revalued. Sale price 10 years after planting is, therefore, a highly speculative matter. Market value cannot lawfully be based on such speculation: Vollmer v. Philadelphia, 350 Pa. 223, 226.

Further, even if it could be shown that the market would remain steady while the trees were growing to salable size, estimated net income, *alone*, is not a proper legal basis, for it can never constitute the exclusive standard for fixing market value of property. In Park's Appeal, 334 Pa. 193, where the income was from rentals, the court said, page 195:

"Appellant lays special stress upon the fact that rental values had declined. While this is a factor to

be taken into consideration, it is not the exclusive test in fixing value. As was said in Algon Realty Co. Tax Assessment Appeal, 329 Pa. 321, 323, 198 A. 49, 'While rental value may be taken into account, it never can constitute the exclusive standard for fixing the market value of property. . . . the appraised value of the property is to be fixed by the opinion of competent witnesses as to what the property is worth in the market at a fair sale.' A reading of the testimony shows that the experts considered declining rentals along with other factors in establishing market value." See also Carnegie, Trustees v. Pittsburgh etc., 357 Pa. 138.

In the instant case, while many factors were considered, all were directed to determining estimated net profit, so that net profit was the sole standard for estimating market value. As shown, profit is a relevant element and may properly be considered, but, by itself, profit is not a proper legal basis for valuation.

The prima facie case established by the assessment cannot stand, and the court must consider what appellants and their witnesses have shown as to market value. Section 704 of the Fourth to Eighth Class County Assessment Law, as amended January 18, 1952, P. L. 2138, 72 PS §5453.704, provides that ". . . the court shall proceed . . . to hear the said appeal and the proofs in the case, and to make such orders and decrees determining from the evidence submitted at the hearing what ratio was used generally in the taxing district and the court shall direct the application of the ratio so found to the value of the property which is the subject matter of the appeal and such shall be the assessment . . ." There is no issue as to the ratio in this case. It is a uniform 50 percent in Warren County. As to valuation, the evidence is not so much conflicting as it is unsatisfactorily

indefinite. The county's valuation is based solely on estimated net profit per acre from the sale of Christmas trees. Appellant's evidence is vague in that no one could give an opinion of the market value of land planted in Christmas trees. Therefore, the court's task is far from simple.

The court's function in these appeals was clearly stated in the case of Traylor v. Allentown, 378 Pa. 489, page 493, as follows:

"It is the action of the court below in proceeding to determine the proper assessment for the property whereof the appellants complain. They argue that, after the city's assessment and the testimony of the appraiser and the assessor had been rejected, the only testimony as to the value of the property was that furnished by the appellants' witnesses and that the court was duty bound, in the circumstances, to accept it. With that contention, we cannot agree. Even with the prima facie case, which the assessment afforded in the first instance, entirely eliminated, the court still had a duty to perform in endeavoring to arrive at a just and equitable assessment from the evidence before it, especially, since the appellants themselves had failed to produce any testimony as to the fair market value of the property."

From the record before it, the court must arrive at a just and equitable assessment, based on actual value limited and defined by market value. The testimony of the county's witnesses was credible in the sense that their veracity was not impeached, but it is questionable as to whether their opinions as to market value may be considered inasmuch as such opinions are based solely on the estimated net profit to be derived when the trees have matured, 10 years after planting. Market value for assessment purposes cannot be based solely on such an estimate. This is the rule when value is based solely

on capitalized rental (Algon Realty Co. Tax Assessment Appeal, 329 Pa. 321, 323), or solely on cost of reconstruction, less depreciation (Traylor v. Allentown, supra, 492), and the rule would also apply when estimated net profit is the sole basis. Also opinions based on speculation as to the price of trees 10 years in the future do not rise to the required standard: Chatfield v. Board of Revision of Taxes, supra, 164; Carnegie, Trustees, v. Pittsburgh, supra, 142.

However, even if the opinion of the county's witnesses as to market value is considered, it is far outweighed by the testimony of appellants and their expert witnesses. These individuals are the owners of the lands in question, or familiar with such lands and similar lands. They all stated unequivocably that the land in Warren County planted in Christmas trees could not possibly sell for as much as $300 an acre or $200 an acre. They knew the value of the land without trees, but most of them testified that there was no market for land planted in trees, that it would be hard to find a buyer and they did not know what such land would sell for, as above shown. There is, however, some evidence as to market value of the land after Christmas trees are planted. The obvious inference from all the testimony is that marginal lands, the type best suited for raising Christmas trees, is worth more after trees are planted. Appellant Capwell, assessed with 75 acres of Christmas tree land in Freehold Township, the same township as appellants in this case, testified that the planting of trees increased the value of land, but "not much during the first two or three years." Appellant McLaughlin, assessed with 1,700 acres of Christmas tree land in Brokenstraw Township, testified that the value of his field had been increased by the cost of the trees plus the cost of planting, but he did not know of any buyer.

All appellants, and Mr. Camp, agreed that the average price paid for land suitable for growing Christmas trees was $10 per acre. The average cost for trees in planting, per acre, is $60, according to the testimony of appellants Cherry, Capwell and Alexander. No other witness gave factual evidence on these items. Therefore, on the evidence before the court, the actual or fair market value of an acre of land planted in commercial Christmas trees is $70.

Argument has been made that Mr. Fuellhart's valuation was inaccurate because it remained the same each year, the inference being that value should increase each year while the trees were growing to market size. And so it should, barring catastrophe, and assuming normal survival rate, normal growth and normal care by way of shearing, etc. The problems raised by attempting to estimate an increased market value each year until the trees have grown to market size, are at once apparent. As one appellant stated: "Nothing is certain about the Christmas tree business." The possible variations are almost infinite, from plantation to plantation, acre to acre, and even from tree to tree. When there are no sales against which to check estimates, this is entirely too doubtful a basis for estimation of market value for assessments.

This is not the place to discuss assessment valuation of timber lands except as comparison with the valuations appealed from may be justified. Mr. Fuellhart testified that he was employed to develop a guide or estimate for the purpose of valuing timber land and Christmas tree lands, and that he used the same method for both. Estimated market value is derived from estimated net profit. However, the estimated valuation of timber lands, 50 percent of which is the assessed valuation, runs from $4 to $12 per acre, while the valuation of Christmas tree land is $300 per acre, that is

25 to 75 times greater. While the difference in classification may be justified, this disparity seems completely unreal and unjustified under the evidence. While the rule of uniformity does not apply between different classes of property with the same force and effect that it applies to all properties within the same class, nevertheless, the same formula, method or procedure cannot be applied to different classes if the result is a wide disparity in valuation, unsupported by evidence. The force of the rule of uniformity is shown in Traylor v. Allentown, supra, where the court said, pages 494 and 495:

"Actually, there was no competent evidence whatsoever adduced at the hearing in the court below as to the *fair market* value of the property. In that situation, the court was confronted with the duty of equalizing the assessment and making it harmonize with the assessments of other properties within the taxing district. In Cumberland Coal Co. v. Board of Revision of Tax Assessments, 284 U. S. 23, 29, which involved a question of equalizing assessments of lands in Pennsylvania, Mr. Chief Justice Hughes said, ' " ' . . . where it is impossible to secure both the standard of the true [i.e. actual] value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.' " ' We lately quoted the foregoing principle with approval in Hammermill Paper Company v. Erie, 372 Pa. 85, 100, 92 A. 2d 422. See also Allentown's Appeal, 147 Pa. Superior Ct. 385, 388, 24 A. 2d 109. And, such was precisely the course which the learned court below pursued in arriving at a just and equitable assessment."

In this connection, it must be noted that the disparity between valuation of Christmas tree and timber lands has been reduced since the hearing on these ap-

peals, by action of the board of tax revision, for the valuation of timber land will be doubled commencing with the 1962 assessment.

Determining market value for tax assessment purposes can be a difficult task when there is no ready market for the land. As was said in Hammermill Paper Co. v. Erie, supra, page 95, "Anyone who has had any experience in land damage or assessment cases knows that even men who are qualified as experts often differ widely in their appraisals or valuations." That is why the Pennsylvania Supreme Court has said:

"Scientific formulas, arithmetical deductions and mental contemplations, have small value in making assessments under our practical system of taxation. The market value of the separate tracts at public sale, after due notice, is the legal basis recognized by our statutes of determining the assessable value of real estate, and until the legislature changes this method, it is binding not only upon the taxing authorities but upon the courts as well": D. L. & W. R. R. Co. v. Luz. Co. Commissioners, 245 Pa. 515, 518.

The trouble here is that the valuation used by the county is not made upon a proper legal basis. It is based solely on estimated net profit to be made by using the land to raise and sell Christmas trees, assuming the sale price for trees will remain the same for 10 years after planting. When a similar error was made in valuing coal lands for assessment purposes, the court said:

". . . Common sense and practical every day business experience are the best guides for those intrusted with the administration of tax laws. Taxation is a practical and not a scientific problem. The question is not what earning or productive power coal lands may develop in the future but what they are actually worth on the market at present. This is the lawful

method of valuation for taxation purposes": Glen Alden Coal Co. v. Commissioners, 345 Pa. 159, 166.

The procedure used by Mr. Fuellhart in making his natural resource valuation is no doubt useful for some purposes, for it is a broad study as to productivity of Christmas tree land in Warren County. However, the method used to determine value must comply with the law even though some other method might seem more logical. As was said in D. L. & W. R. R. Co. v. Luz. Co. Commissioners, supra, page 518:

"The law requires that the valuation of real estate for the purpose of taxation shall be determined upon the basis of market value, or rather actual value, limited and defined by market value. What the law requires cannot be disregarded no matter how desirable some method not authorized might prove to be: Pennsylvania Stave Company's App., 236 Pa. 97."

For the reasons stated, and after careful consideration of all the evidence pursuant to and in accord with the controlling legal principles hereinabove set forth, it is the court's opinion, and so held, that the just and equitable valuation of Christmas tree land is $70 per acre; and it is further held that this valuation shall apply to all land in Warren County planted in trees which are intended to be sold as Christmas trees, as long as such trees have not grown beyond the customary market size. . . .

The assessment appealed from in this case shows a total of 119 acres of land of which 79 are listed as timber land at a valuation of $8 per acre, or $632, concerning which there is no dispute, and 40 acres are listed as Christmas tree land for which the valuation is $70 per acre as here decided, or $2,800. The total valuation is, therefore, $3,432, and the property should be assessed for tax purposes for the year 1959 at $1,-

716 in accordance with the 50 percent uniform ratio established for the county.

Wherefore the court makes the following order:

### Order

And now, March 22, 1961, for the reasons stated in the foregoing opinion, it is hereby

Ordered, adjudged and decreed that the appeal of E. T. Cherry from the assessment identified on his property record card as YV-1-8374, being 119 acres of land in Freehold Township, Warren County, for the year 1959, be and it is hereby sustained, and said assessment is reduced from $4,315 to $1,716. The assessment of $4,315 is based on the value of $200 per acre, the board not having made the correction to $300 per acre in view of the fact that the matter was to be litigated.

Costs of this appeal to be paid by Warren County.